UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SIMONA BOST,

                                    Plaintiff,                          **REPORT AND**
                                                                        **RECOMMENDATION**
            -against-                                                   CV 17-6230 (GRB) (ARL)

NASSAU COUNTY DEPARTMENT OF SOCIAL
SERVICES, NASSAU COUNTY OFFICE OF
EQUAL EMPLOYMENT OPPORTUNITY and
NASSAU COUNTY,

                                    Defendants.
-----------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        The plaintiff, Simona Bost ("Bost"), commenced this action against the Nassau County

Department of Social Services ("DSS") and the Nassau County Office of Equal Employment

Opportunity ("EEO") (collectively, the "defendants"), alleging that DSS discriminated against

her based on her disability and failed to provide her with a reasonable accommodation.   ECF

No. 1.   On November 16, 2017, the County of Nassau (the "County") filed an answer on behalf

of DSS and the EEO.[1]  ECF No. 6.   Before the Court, on referral from District Judge Brown, are

the parties' cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the reasons stated below, the Court respectfully recommends that the defendants' motion be

granted and the plaintiff's cross motion be denied.

## BACKGROUND

### A.   Factual Background

        The following facts are drawn from the parties' Local Rule 56.1 Statements and are

uncontested unless otherwise noted.[2]

---

[1]After the defendants filed their answer, the County was added to the docket sheet as a named defendant.
[2]Local Rule 56.1 requires a party moving for summary judgment to submit a "short and concise statement, in

1.    **The Parties**

Bost has been an employee of DSS since April 9, 2007.   Defs.' 56.1 Stmt. ¶¶ 1, 14.

Bost is a member of the Nassau Local 830 Civil Service Employees Association, Inc. ("CSEA").

*Id.* ¶ 11.   As a member of the CSEA, the terms and conditions of Bost's employment are subject

to the collective bargaining agreement between Nassau County and the CSEA ("CBA").   *Id.* ¶

12.   DSS is a department of the County promulgated by the County's Administrative Code.   *Id.*

¶ 3.   It is charged with providing financial assistance and services to residents of Nassau County

in accordance with state and federal laws and regulations.   Broderick Aff. ¶ 3.   The EEO is also

a department of the County.   Defs.' 56.1 Stmt. ¶ 4.   Nonparty Paul Broderick ("Broderick") was

the Deputy Commissioner for DSS during the relevant time period at issue in this lawsuit.   Pl.'s

56.1 Counter-Stmt. ¶ 72.   Nonparty Mary Elizabeth Osterman ("Osterman") has been the

Director of the EEO since 2005.   Defs.' 56.1 Counter-Stmt. ¶ 73.

2.    **Bost's Assignments**

Bost was initially hired as a Social Worker Examiner I ("SWEX I").   Defs.' 56.1 Stmt. ¶

14.   Her first assignment was in Medicaid, where she worked for one month.   *Id.* ¶ 15.   On or

about May 11, 2007, Bost was transferred to Medicaid/Comm.   *Id.* ¶ 16.   On or about

---

numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be
tried" and requires that each numbered paragraph be supported "by citation to evidence" in the record.   *See* Local
Rule 56.1(a).   In this case, many of the parties' statements are missing those citations.   As such, although the facts
are not in dispute, the undersigned has reviewed the record to determine if the parties have met their burden of
showing the absence of a genuine issue for trial.   *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d
241, 244 (2d Cir. 2004) (district court may not rely solely on the statement of undisputed facts contained in the
moving party's Rule 56.1 statement).

In addition, it warrants mention that the Declaration of Jennean Rogers was initially e-filed with this Court on
February 14, 2022 without the appropriate exhibits attached.   The County has, however, confirmed that Bost was
served with all of the exhibits on September 10, 2021.   ECF No. 78.   In addition, the County has filed a corrected
document.   ECF No. 77.

November 1, 2008, Bost was again transferred, this time, to Child Protective Services ("CPS") where she remained for a year. *Id.* ¶¶ 17, 18. One month later, she was appointed to the title of Case Worker I. *Id.* ¶ 18. However, in November 2009, at her request, Bost was reinstated to the SWEX I title because she found CPS to be too stressful. *Id.* ¶ 19. Specifically, Bost felt overwhelmed and helpless having to decide whether or not to remove children. *Id.* ¶ 20.

As a result, from July 1, 2009 to December 3, 2009, Bost worked in the CPS Indicated Services Unit. *Id.* ¶ 21. Then, on December 4, 2009, Bost was transferred to a SWEX position in the Job Development and Placement Unit. *Id.* ¶ 22. She stayed in the Job Development and Placement Unit until November 2, 2010, when she was transferred into the Employment/Work Experience Program (WEP) Unit. *Id.* ¶ 23. She appears to have worked in the WEP Unit for approximately three years until she requested a transfer because she was having problems with her Program Director. *Id.* ¶ 24. Accordingly, on September 3, 2013, Bost was transferred into the Disabled Client Assistance Program ("DCAP") Unit. *Id.* Shortly thereafter, Bost was promoted to SWEX II. *Id.* ¶ 25.

According to the Civil Service Specification, the duties of a SWEX II include, among other things, determining financial and categorical eligibility for complex cases and reviewing and validating eligibility for prior determinations. Rogers Decl. Ex. K. The Civil Service Class Specifications also requires all SWEX II employees to have a supervisor available whenever they are working. Defs.' 56.1 Stmt. ¶ 26. Accordingly, despite her promotion, Bost had to wait until November 26, 2013 to be reassigned into the SNAP Unit due to an ongoing review of DSS staffing needs. *Id.* ¶ 27. Her transfer to the SNAP Unit became effective on December 2, 2013; however, after less than one week, she was transferred back to the DCAP

3

Unit because she was insubordinate to her supervisor.    *Id.* ¶¶ 27-8.

On or about January 5, 2016, after working in the DCAP Unit for approximately three years, Bost submitted another request to be transferred to "Daycare, Public Assistance, Medicaid, APS, CPS or Foster Care." *Id.* ¶ 29.    Specifically, Bost complained that she was performing the work of a "clerk" instead of work consistent with her title.    *Id.*    In response, on January 28, 2016, Bost was transferred to another DCAP Unit.    *Id.* ¶ 30.    However, a few weeks after her transfer, Bost filed an EEO complaint against Sunita Manjrekar, the director of the DCAP and her supervisors, Eileen Scannapicco and Joanne Snopkowski, for discrimination, harassment and retaliation.    *Id.* ¶¶ 31, 32.    Bost claimed that her new supervisors were "calling her out for petty contrivances," such as having a messy desk.    *Id.* ¶ 31.    Nonetheless, in her EEO Complaint, Bost suggested that the County could resolve the discrimination complaint by simply transferring her to the Daycare Unit.    *Id.* ¶ 33.    Although her allegations of discrimination, harassment and retaliation were deemed unfounded, on May 13, 2016, Bost was transferred to a Daycare Unit. *Id.* ¶¶ 32, 34.

Although she received her desired transfer, on May 17, 2016, Bost still met with Ostermann and two DSS EEO representatives, Justine Hanif Carr ("Carr') and Yolanda Hall-Miller ("Hall-Miller"), to discuss some of the issues raised in her EEO Complaint.    *Id.* ¶ 35. After an hour-long meeting, Bost was advised that her EEO Complaint did not meet the criteria of an EEO rights violation because the examples she provided were largely personnel issues and personality conflicts.    *Id.* ¶ 36.

Bost remained with the Daycare Unit for approximately nine months and then, once again, requested to be transferred.    *Id.* ¶ 37.    This time she claimed to be "unable to perform

4

[the] stressful workload." *Id.* ¶ 38.   DSS immediately notified her that her request was being referred for possible future consideration.   *Id.* ¶ 38.   In the end, Bost was required to remain in her Daycare Unit for an additional seven months at which point she was transferred into a different Daycare Unit.   *Id.* ¶ 39.   Then, in December 2017, Bost was offered but declined a transfer to DSS' Telephone Unit.   *Id.* ¶ 40.   She declined the offer because the Telephone Unit had a strict 4:45 p.m. end time and, by that point, Bost had requested a change in her schedule as a reasonable accommodation.   *Id.*   As discussed in detail below, by April 2016, Bost was permitted to start work 30 minutes later.   *Id.* ¶ 47.   Accordingly, had Bost accepted the job in the Telephone Unit, Bost would have had to cut her lunchtime by 30 minutes or revert back to her original work schedule.[3]   Pl.'s 56.1 Counter-Stmt. ¶ 71.   Bost contends she was unable to do so because her diet is very important for diabetes, she rarely cooks and the 30-minute lunch break would have prevented her from leaving the building to get food.   Bost Aff. ¶ 24.   For this reason, Bost remained in the Daycare Unit until January 11, 2019, when she was transferred to the Temporary Assistance Division due to her request for a non-caseload position.   Defs.' 56.1 Stmt. ¶ 41.

### 3.    Bost's First Accommodation Request

As noted above, in April 2016, while Bost was still working in a DCAP Unit, she filed a request for an adjusted work schedule as a reasonable accommodation.   *Id.* ¶ 43.   The normal work hours for DSS employees is Monday through Friday, 9:00 a.m. to 4:45 p.m.   *Id.* ¶ 42. Bost asked to change her schedule to 9:30 a.m. to 5:15 p.m. claiming that she was suffering from

---

[3] DSS employees are given one hour for lunch and one fifteen minute break.   Pl.'s 56.1 Counter-Stmt. ¶ 70.   Bost claims that she was advised by a CSEA staff member that union members could not agree to a 30-minute lunch period.   *Id*. ¶ 69.

diabetes, which caused her to be fatigued and suffer from chronic insomnia.  *Id.* ¶ 44.   In support of her request, Bost provided a note from her medical provider stating that she "is experiencing fatigue." *Id.* ¶ 45.   Although Bost's position required a supervisor to be available while she was working and her note failed to state that Bost was undergoing any treatment for the diabetes, DSS nonetheless granted her request for an accommodation because they had a supervisor available until 5:45 p.m. on weekdays.  *Id.* ¶¶ 46-9.   As such, beginning on May 13, 2016, Bost changed her daily working hours to 9:30 a.m. to 5:15 p.m.  *Id.* ¶ 48.

### 4.    Bost's Overtime Request

Three months later, Bost then asked to work overtime on the weekends to manage her caseload.  *Id.* ¶ 58.   As previously stated, Bost was a member of the CSEA.   As such, her request to work overtime as a further accommodation was subject to the rules set forth in the CBA.  *Id.* ¶ 50.   Specifically, section 28-1.1 of the CBA provided:

> All work in excess of an employee's basic work week and/or tour-of-duty is overtime. . ..
>
> Any employee who is directed by an authorized supervisor to engage in work, and who reports to work at a time which is not contiguous to the beginning or ending of the employee's normal work day or tour-of-duty, shall be guaranteed a minimum of four (4) hours pay at the overtime rate.

*Id.* ¶¶ 52, 55.   Consequently, DSS did not authorize overtime on weekend days where an employee was unable to work a minimum of four hours.[4]  *Id.* ¶ 56.

With these restrictions in mind, DSS temporarily granted Bost's request for an accommodation by offering her a chance to work on Saturdays between 8:00 a.m. to 12:00 p.m.

---

[4] Bost was unable to work overtime during the five-day work week.   This is because, by the time Bost had submitted the request to work overtime, Bost had already received an accommodation to alter her schedule to 9:30 a.m.-5:15 p.m.   Pursuant to the CBA and DSS policy, Bost would have been required to work overtime for one additional hour to 6:15 p.m.  *Id.* ¶ 59.   However, DSS did not have supervisors working until 6:15 p.m.  *Id.* ¶ 60.

twice a month when staff and supervisors were present.  *Id.* ¶¶ 57, 66.  According to Bost, she was also permitted to work overtime three evening a week.  Bost Aff. ¶ 12.  But, before DSS would make the accommodation more permanent, DSS requested an updated medical note from Bost to confirm her ability to work between 8:00 a.m. and noon on Saturdays because Bost had previously claimed she was unable to start work by 9:00 a.m. and that she was suffering from fatigue.  Defs.' 56.1 Stmt. ¶¶ 44-5, 62.  In response, in November 2016, Bost submitted a prescription pad note from her doctor, which simply stated, "Pt can do overtime at work." *Id.* ¶ 63.  The note did not clarify if Bost was able to begin work at 8:00 a.m. or if she could work an additional four hour shift during the workweek.  *Id.* ¶ 64.  Bost was, therefore, advised that the note was inadequate and was given six weeks to submit an appropriate note.  *Id.* ¶ 65. However, Bost did not provide any additional medical documentation to clarify her ability to work four hours of overtime on weekends.  *Id.* ¶ 67.  According to Bost, she refused to do so because she thought it was unfair to require her to document the need for overtime when it was her position that was causing her to suffer from the condition in the first place.  Rogers Decl. Ex. E. 94:11-25.

In any case, by December 2016, Bost claimed she was no longer interested in working overtime in Daycare under any circumstances.  *Id.* ¶ 68.  To this end, Bost claims that in response to her increased workload and feelings of persecution, she suffered a major depressive episode.  Bost Aff. ¶ 13.  Bost continues to work at DSS in the Temporary Assistance Division without a caseload.  Pl.'s 56.1 Counter-Stmt. ¶ 75; Broderick Aff. ¶ 39.  Her title has not been altered and there is no indication in the record that her salary or benefits have changed.

## B.    Procedural Background

On February 17, 2017, Bost filed a dual Complaint with the New York State Division of Human Rights ("SDHR") and the United State Equal Employment Commission ("EEOC") accusing the defendants of discrimination on the basis of disability, race and color as well as retaliation surrounding her request for overtime.    Defs.' 56.1 Stmt. ¶ 5.    One month later, in March 2017, DSS granted Bost's request for two weeks of medical leave due to symptoms pertaining to depression.    Broderick Aff. ¶ 66.    In August 2017, the SDHR dismissed Bost's complaint at her request.    ECF No. 1.    According to the complaint, Bost withdrew the request because she was experiencing "a major depressive episode." Compl. ¶ 16.    Shortly thereafter, the EEOC issued a Dismissal and Notice of Rights.    Defs.' 56.1 Stmt. ¶ 7.

Bost never filed a Notice of Claim with the County.    *Id.* ¶ 8.    Nor did Bost request any additional accommodations in 2017.    Bost commenced this action on November 3, 2017.    ECF No. 1.    The crux of Bost's complaint is that the defendants discriminated against her due to her disability (diabetes, depression, fatigue, insomnia) and denied her ability to work overtime as an accommodation.[5]  *Id.*

### DISCUSSION

## A.    Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead,* No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012)

---

[5]  Bost also takes issue with the fact that the defendants' required her to submit additional documentation to support her request for weekend overtime and notes in the conclusion that the defendants also mishandled her requests for transfers.

(quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).   In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998).   If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.   *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996), cert denied, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.   Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."   *Gallo v. Prudential Residential Servs.,* L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).   When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).   "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."   *Jamaica Ash & Rubbish v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322).   A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."   *Marks v. New York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

9

### B.   McDonnell-Douglas Burden-Shifting Framework

In an employment discrimination case such as this, where there is no direct evidence of discriminatory conduct, a plaintiff's discrimination claim brought under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA') and the New York Human Right Law ("NYHRL") must be analyzed under the now familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).   *See Sista v. CDC Ixis N. Am., Inc*., 445 F.3d 161, 169 (2d Cir. 2006).   Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination *vel non*;" and, thus, (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that race discrimination was an actual reason for the adverse employment action.   *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000).   Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*   With these principles in mind, the Court turns to an analysis of the plaintiff's ADA and NYHRL claims.

### C.   Discrimination under the ADA

The ADA prohibits employment discrimination by a "covered entity . . . against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Sista*, 445 F.3d at 169.   Moreover, employers of

persons with disabilities are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §§ 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).   To establish a *prima facie* case of disability discrimination in a reasonable accommodation case, plaintiffs must establish that (1) they are persons with disabilities under the meaning of the ADA; (2) an employer covered by the statute had notice of their disabilities; (3) with or without reasonable accommodation, plaintiffs could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.   *Graves v. Finch Pruyn & Co*., 457 F.3d 181, 184 (2d Cir. 2006) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).   "Once [the plaintiffs put] forth a *prima facie* case, the burden shifts to the employer to demonstrate that the [employees'] proposed accommodation would result in an undue hardship." *Scalera v. Electrograph Sys., Inc.,* 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (citing *Stone v. City of Mount Vernon,* 118 F.3d 92, 97 (2d Cir. 1997)).   In the instant matter, the defendants maintain that Bost cannot establish a *prima facie* case of disability discrimination because she has not established that she was disabled within the meaning of the ADA, that she was able to perform the essential functions of her job or that the County refused to provide her with a reasonable accommodation.   The undersigned agrees.

To begin with, Bost has not sufficiently alleged that she suffered from a disability within the meaning of the ADA.   "A person has a 'disability' under the ADA if he has: (a) 'a physical or mental impairment that substantially limits one or more [of his or her] major life activities,' (b) 'a record of such an impairment,' or (c) is 'regarded as having such an impairment.'" *Ibela v. Allied Universal,* No. 21-1995-CV, 2022 WL 1418886, at *1–2 (2d Cir. May 5, 2022) (citing 42

U.S.C. § 12102(1)).   "Major life activities include 'caring for oneself, performing manual tasks, seeing, hearing, eating . . . and working.'" *Id.* (citing 42 U.S.C. § 12102(2)).   The Second Circuit has held that in order "[t]o determine whether a major life activity is substantially limited by an impairment," courts are to consider "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Id.* (citing *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005)).

Here, Bost alleges that she is disabled due to her "diagnosed medical ailments (diabetes, depression, fatigue [and] insomnia." *See* Compl. ¶14.   However, the only evidence of her condition is a note written on a prescription pad that states "Patient has diabetes. She is experiencing fatigue." The Second Circuit has made clear that a diagnosis alone is insufficient to establish a disability under the statute.   *Id.* (citing *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S 184, 198 (2002) ("It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment."), overturned on other grounds by ADA Amendments Act of 2008, Pub. L 110-325, 122 Stat. 3553 (Jan. 1, 2009)).   As such, the doctor's note confirming that Bost was diagnosed with diabetes was insufficient to establish that she suffered from a disability within the meaning of the ADA.

Moreover, Bost has failed to offer any proof that her fatigue and insomnia, which she now claims were linked to her diabetes, substantially limited one or more of her major life activities.   *See Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 15 (2d Cir. 2011) (confirming district court's determination that plaintiff's back injury, extreme fatigue and insomnia linked to her thyroid cancer were not disabilities under the ADA).   Indeed, there is nothing in the record to suggest that Bost's alleged problems were "any worse than is suffered by a large portion of the

nation's adult population." *See Farina*, 458 F. App'x 13, at 15.   Nor has Bost offered any medical evidence to substantiate her claim that she suffered from depression.   In fact, Bost never requested a reasonable accommodation based on her alleged depression.   Rather, Bost included for the first time a cursory reference to the fact that she was suffering from "major depression" in her amended EEO complaint.   *See* Roger Decl. Ex. O; *see also McEntee v. IBM*, 783 F. Supp. 2d 434, 444 (S.D.N.Y. 2011) ("the presence, duration and ever-varying severity of depression cannot be adequately perceived or accommodated unless an employee informs in some manner her employer of her limitations as a result of such a disability.").   Accordingly, Bost has not established that she was disabled within the meaning of the ADA.

Second, at least with respect to the time period between 2017-2019, Bost cannot establish that she was able to perform the essential functions of her job with or without an accommodation.   To be clear, when Bost initially sought a reasonable accommodation, that being, a shift in her work schedule, she did so on the basis of her diabetes, fatigue and chronic insomnia.   Defs.' 56.1 Stmt. ¶ 44.   In fact, Bost admitted at her deposition that when she later requested the opportunity to also work overtime to help manage her caseload, she had not yet "discombobulated" or gone into a "major depression."   Rogers Decl. Ex. E 78:5-79:4. Nonetheless, Bost now claims that the events of this lawsuit took place between 2016 and 2019. *See* Pl.'s 56.1 Counter-Stmt. ¶ 74.   As such, it warrants mention that Bost acknowledges that by late December 2016, she was completely unable to handle her caseload.   Indeed, one month after she filed complaints with the SDHR and the EEOC, Bost requested, and was granted, a two week medical leave due to symptoms pertaining to depression.   Broderick Aff. ¶ 66.   According to her testimony, by December 2016, she would just sit at her desk "not doing what she was

13

supposed to be doing." Rogers' Decl. Ex. E, 100:11-8, 104:7-22.   In fact, she testified at her deposition that she wanted to go back to clerk duties – non SWEX duties - because her mind was gone and she wasn't even trying.   *Id.*   She further testified that at some point following her request for overtime she was "disassociating." *Id.* 96:14-22.   As such, to the extent Bost appears to be claiming that she was discriminated against between 2017 and 2019, Bost's ability to perform the essential functions of her job as an SWEX II is certainly in question.

Finally, Bost has utterly failed to demonstrate that she was deprived of a reasonable accommodation.   It is undisputed that Bost received an accommodation in April 2016 after she claimed to be suffering from fatigue, insomnia and diabetes.   Specifically, on April 28, 2016, DSS granted her request for an accommodation and, beginning on May 13, 2016, changed her daily working hours to 9:30 a.m. to 5:15 p.m.   Defs' 56.1 Stmt. ¶¶ 47, 48.   According to Bost, shortly thereafter, DSS also granted her request to be transferred from DCAP because the "hostile environment" at DCAP was exacerbating her symptoms, particularly her depression. Bost Aff. ¶ 8.

DSS also temporarily granted Bost's request to work overtime on the weekends but demanded medical documentation to confirm her ability to work within the constraints of the CBA.   To this end, DSS reasonably sought, among other things, to confirm Bost's ability to begin work at 8:00 a.m. and to add an additional four hours to her work week.   *Id.* ¶¶ 44-5, 60, 62.   It is clear from the record that, by that point, Bost had already claimed that she was fatigued and was unable to start work at 9:00 a.m.   However, the doctor's note she submitted in response to the request for documentation said nothing about her ability to work from 8:00 a.m. to 12:00 p.m. on Saturdays.   *See Jacobson v. Capital One Fin. Corp.*, 2018 U.S. Dist. LEXIS 211312 *

14

83 (S.D.N.Y. Dec. 12, 2018) ( The ADA requires employees to engage in "interactive processes" with their employers " in order to help the employer identify the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.").

Furthermore, despite her current complaints, by December 2016, Bost claimed she was no longer interested in working overtime in Daycare under any circumstances. *Id.* ¶ 68. Accordingly, for all these reasons, the undersigned finds that Bost has not established a *prima facie* case of ADA discrimination based on a failure to provide a reasonable accommodation and respectfully recommends the defendants' motion for summary judgment with respect to the ADA claim be granted and Bost's cross motion for summary judgment be denied.

### D.    Discrimination Claim under the NYHRL

Lastly, the Court must address Bost's allegations to the extent that they have been asserted under the NYHRL.   While it is true that the NYHRL definition of "disability" is broader than that of the ADA in that the NYHRL does not require that the impairments "substantially limit" a major life activity, *see* N.Y. Exec. Law § 292(21), Bost's failure to provide any evidence of a disability other than a diagnosis as well as her a failure to offer any evidence to suggest that she was deprived of a   reasonable accommodation remain grounds for dismissing the state cause of action.   In addition, Bost's failure to file a timely notice of claim also precludes a claim under NYHRL.   "State claims brought under state law in federal court are subject to state procedural rules." *Keating v. Gaffney,* 182 F. Supp. 2d 278, 290 (E.D.N.Y. 2001) (citing *Felder v. Casey*, 487 U.S. 131, 141, 108 S. Ct. 2302, 2313–14, 101 L. Ed. 2d 123 (1988)). To this end, Section 52 of the County Law provides, in relevant part:

> Any claim or notice of claim against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature . . . and any other claim for damages arising at law or in equity, alleged to have been cause or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in accordance with section fifty-e of the general municipal law.

County Law § 52(1).   "Section 50–e, . . . in turn, states that '[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action . . . the notice of claim shall . . . be served . . . within ninety days after the claim arises.'" *Id.* (holding that the 50-e notice of claim requirement applies to discrimination actions against the County even though employment discrimination is not a tort).   In this case, Bost failed to file a timely Notice of Claim pursuant to County Law § 52.   Therefore, to the extent Bost's claims have been asserted under the state law, the undersigned recommends that those claims also be dismissed.

### E.    Retaliation

Lastly, the undersigned also recommends that Bost's claims be dismissed to the extent Bost now appears to be arguing that the failure to permit her to work overtime was in retaliation for having requested an altered work schedule and having submitted a complaint against her DCAP supervisors.   To begin with, there is no evidence in the record that suggests a retaliatory relationship between her alleged protected activities – the filing of an EEO complaint against her DCAP supervisors and her first request for an altered work schedule - and the defendants' alleged refusal to provide her overtime.   While Bost may have filed an EEO complaint and requested an altered time schedule in the same year as she asked to work overtime, without more, no reasonable jury could conclude she was denied the right to work overtime purely out of

16

retaliation.   *Sivio v. Vill. Care Max,* 436 F. Supp. 3d 778, 801–02 (S.D.N.Y. 2020) (temporal proximity alone is insufficient to satisfy a plaintiff's burden to bring forward some evidence of pretext).

Moreover, as stated above, Bost has failed to establish that she was actually denied the accommodation.   Bost was permitted to work overtime for approximately six weeks during which time she was asked to provide DSS with a doctor's note to enable it to identify the precise limitations of her disability and any potential reasonable accommodations that could overcome those limitations.   Her first note, which simply stated "Pt can do overtime at work," was clearly insufficient and she refused to submit additional medical documentation.   She then advised the defendants that she was no longer interested in working overtime in Daycare under any circumstances because her mental state had worsened.   An employee who is responsible for the breakdown of the interactive process may not recover for a failure to accommodate.   *Id.* (citing *Nugent v. St. Lukes–Roosevelt Hosp. Ctr.,* 303 F. App'x 943, 945-46 (2d Cir. 2008)).   As such, Bost has failed to submit any evidence establishing that she experienced an adverse action because she filed an EEO complaint or requested a reasonable accommodation.[6]   For these reasons, the undersigned recommends that Bost's cross motion be denied with respect to her retaliation claim.

---

[6] "To establish a *prima facie* case of retaliation under the ADA, a plaintiff is required to show by a preponderance of the evidence that: (1) she participated in a protected activity under the ADA; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 719 (S.D.N.Y. 2020)/ "[T]o prevail on a retaliation claim under the NYCHRL, [a] plaintiff must show that [he] took an action opposing [his] employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action[.]" *Id.*

**OBJECTIONS**

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections.    Such objections shall be filed with the Clerk of the

Court via ECF.    Any requests for an extension of time for filing objections must be directed to

Judge Brown prior to the expiration of the fourteen (14) day period for filing objections.

Failure to file objections within this period waives the right to appeal the District Court's Order.

*See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc.*, No. 17-3446, 2018

U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived

any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S.

140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants*

*Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:   Central Islip, New York
         June 30, 2022

                                                    _____/s_____
                                                    ARLENE R. LINDSAY
                                                    United States Magistrate Judge

18